**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**JUDY A. TUCKER,**

                    **Plaintiff**

  **against**                        **CASE NO.  05-CV-1451 (GTE-DRH)**

**HARTFORD LIFE AND ACCIDENT**
**INSURANCE CO.,**
                    **Defendant**

**G. THOMAS EISELE, SENIOR DISTRICT JUDGE, sitting by designation[1]**

**MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT**

      Before the Court are Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment presenting the issue of whether Plaintiff Judy A. Tucker is entitled to long term disability benefits.  After review of the parties' submissions, the record in this case and careful consideration of the issues presented thereby, the Court concludes that Defendant's Motion for Summary should be denied, and Plaintiff's Cross Motion for Summary Judgment should be granted to the extent stated herein.

**FACTS**

      This matter involves Plaintiff's claim for long term disability benefits pursuant to the Group Insurance Policy issued by Defendant Hartford Life and Accident Insurance Company

---

     [1]  On April 27, 2006, this case was reassigned to the undersigned visiting judge for all further proceedings.

("Hartford") (Group Insurance Policy Number GLT-24256), which provided long term disability benefits for eligible employees to The Grand Union Companies.

Pursuant to the Policy, eligible employees are entitled to receive long term disability benefits so long as they are "Totally Disabled" throughout and after the Elimination Period, and as long as the claimant provides Hartford with satisfactory proof of entitlement to said benefits. The Policy states that the term "Disabled means either Totally or Partially Disabled." The Policy defines "Totally Disabled" as:

> (1) during the Elimination Period; and
> (2) for the next 24 months,
> you are prevented by disability from doing all the material and substantial duties
> of your own occupation.

> After that, and for as long as you stay Totally Disabled, you are prevented by
> Disability from doing any occupation or work for which you are or could become
> qualified by:
> (1) training;
> (2) education; or
> (3) experience.

The Policy defines the term "Disability" as any "(1) accidental bodily injury; (2) sickness; or (3) pregnancy." Thus, individuals with a disability that prevents them from performing the duties of their own occupation will be entitled to benefits for twenty-four months. After that, the claimant must be unable to perform the duties of any occupation or work which they are qualified, or could become qualified, to perform.

The Policy also provides:

You will be paid benefits if you:

2

(1) become Totally Disabled while under the Limiting Age;

(2) remain Totally Disabled throughout the Elimination Period;

(3) remain Disabled beyond the Elimination Period; and

(4) submit proof of loss satisfactory to The Hartford.

. . .

The Hartford will pay benefits until the first to occur of:

(1) the date you are no longer Disabled;

(2) the date you fail to furnish proof that you are continuously Disabled . . .

On or about June 12, 1988, Plaintiff began her employment by The Grand Union Company as a deli clerk.  Incidental to that employment, Plaintiff was covered under the terms of The Grand Union Company's long term disability employee welfare benefit plan, which was fully insured by the Policy issued by Hartford.  On March 25, 1994, Plaintiff injured her shoulder and back while lifting a large box of chicken.  Plaintiff was awarded Worker's Compensation benefits for this injury.

On January 25, 1995, Hartford received a claim for group long term disability benefits relative to Plaintiff's injury, which included an employer statement, attending physician statement, and other supporting documentation.  In the Attending Physician's Statement of Disability (dated January 4, 1995), Dr. Barton Sachs stated that Plaintiff had been diagnosed with "cervical spondylosis [with] cervical discogenic pain syndrome."  Dr. Sachs also reported that Plaintiff's subjective symptoms included "cervical pain, facial pain, periorbital pain, left shoulder pain with numbness into left arm," and that the Plaintiff's x-rays and MRI scan were consistent with the diagnosis rendered.  While Plaintiff was being treated with a soft cervical collar and physical therapy, Dr. Sachs noted that Plaintiff was scheduled for a cervical discectomy C5-6.

Hartford was aware at this time that Plaintiff was confined to the house, but nonetheless ambulatory.  Additionally, Edna Golych, in evaluating the claim, noted that Plaintiff's daily activities were "very limited; son, daughter and her mother do work, can only sit for about 20 minutes."

After receiving these claim documents from Plaintiff, Hartford began processing Plaintiff's claim for long term disability under the Policy, making numerous requests for information from Plaintiff's medical providers.  After receiving medical records from Plaintiff's physicians and conducting an interview of Plaintiff, the claim examiner recommended approving Plaintiff's claim for benefits under the Policy.  On February 21, 1995, Plaintiff's claim for long term disability benefits was approved by Hartford, retroactive to September 26, 1994 (at the conclusion of the six (6) month elimination period).  Hartford's in-house nurse noted, "It is apparent that she is not going to be able to [return to work] at any [time] in the near future and is most probably permanently disabled."  Thereafter, Plaintiff continued to receive benefits under the Policy, and would continue to receive benefits so long as she continued to provide Hartford with evidence that she continued to be disabled.

In 1996, Ms. Tucker was awarded social security benefits based upon a finding that she did "not have the residual functional capacity for even sedentary work . . . ."  On June 9, 1997, Hartford notified Plaintiff that, effective September 26, 1996, Plaintiff qualified for long term disability benefits under the "any occupation" standard.

In late 2004 or early 2005, Anne Marie Kirner, the specialist assigned to Plaintiff's claim, began a re-examination of Plaintiff's claim for long term disability benefits.  Ms. Kirner's re-evaluation included a review of an Attending Physician Statement dated October 2004, in which

Dr. Ramaswami listed "chronic back pain" as Plaintiff's primary diagnosis and "fibromyalgia" as Plaintiff's secondary diagnosis.  Dr. Ramaswami did not specifically list any test results or physical examination findings, although Plaintiff asserts that Dr. Ramaswami relied upon all the medical records in the file.  Dr. Ramaswami noted that Plaintiff was most recently treated on October 28, 2004, is treated "as needed."  Although Dr. Ramaswami stated that Plaintiff had not been referred to any other physician, surgery had not been performed, and Plaintiff was not hospitalized for this condition, Plaintiff notes that the record indicates that an anterior C5-6 discectomy with decompression and bone grafting from the right iliac crest with instrumentation was performed on January 24, 1996.  Dr. Ramaswami also stated "unable for prolonged" next to standing, walking, sitting, lifting/carrying, reaching/working overhead, pushing, pulling, driving, and keyboard use/repetitive hand motion.

Ms. Kirner also reviewed a claimant questionnaire completed by Plaintiff on November 5, 2004, in which Plaintiff asserted that she had the following conditions: cervical disc disease, fibromyalgia pain left shoulder, neck and back, numbness in her neck, shoulder, and arm, and headaches.  Plaintiff also stated that her condition had become "progressively" worse "to other parts of the body" and that she was still unable to engage in the types of activities that she engaged in prior to her injury.  Plaintiff did not indicate that she was unable to perform her activities of daily living, and confirmed that she had consulted with or been treated by only one physician in the preceding eighteen months–Dr. Ramaswami.

Additionally, Ms. Kirner conducted a telephone interview with Plaintiff on January 13, 2005, during which Plaintiff confirmed that she underwent neck surgery many years prior, and that her condition has become "worse" since that time.  Plaintiff stated that she had bilateral hand

numbness (though worse in her left hand), and that her back pain made her unable to sit still for long periods of time.  Plaintiff confirmed that she was only being treated by Dr. Ramaswami, and was taking Xanax, Ibuprofen, and Tylenol.  Plaintiff explained that she was able to drive, but only to the drug store, and that while she was able to ambulate without a cane, she limited herself from moving around too much.  Plaintiff also reported that she did not engage in many activities of daily living, such as cooking, laundry, food shopping or yard work, which is all performed by family members.

On January 10, 2005, Ms. Kirner sent a letter to Dr. Ramaswami requesting all medical records regarding Plaintiff from January 1, 2004.  She also requested the following:

> Also, please provide a brief narrative description of Ms. Tucker's current capabilities and limitations.  What is her diagnosis and how you are currently treating her?  How does she function on a day to day basis?  Does she require assistances at home?  Is able to ambulate without assistance?  Can she drive?

By letter dated January 17, 2005, Dr. Ramaswami responded to Ms. Kirner's request as follows:

> I am treating Ms. Judy Tucker for back pain, neuropathy, and reflex sympathetic dystrophy.  Presently she is incapable of working.  She is in chronic pain requiring pain medications and is unable to use her upper extremities on a constant basis. She is able to take care of her ADLs [activities of daily living] and does not require assistance at home.  She is able to ambulate without assistance, and she can drive.  However, her pain symptoms are chronic and constant.  No MRIs have been done since the last report.

In addition to his January 17, 2005 letter, Dr. Ramaswami's office provided numerous pages of medical records spanning a period from January 2004 through January 2005.  These medical records indicated that while Plaintiff had hit her head on a tabletop in the Post Office on January 8, 2004, and thereafter, reported head and neck pain, as well as some visual disturbance, an x-ray

6

of her cervical spine revealed no new injury.  Dr. Ramaswami's medical records also noted several office visits for sinusitis and accompanying symptoms.  Plaintiff reported shortness of breath, but Dr. Ramaswami concluded it was not a serious condition and did not render a new diagnosis.  Plaintiff reported that she had fallen two weeks before her October 25, 2004 office visit.  Plaintiff alleged that she injured her right arm and further injured her back, and Dr. Ramaswami prescribed Plaintiff Lortab (for pain), and did not order any x-ray or other scan to see if any further injury had occurred.

The medical records also indicated that during two office visits in November 2004, Dr. Ramaswami concluded that Plaintiff had an upper respiratory infection and sinusitis, and prescribed medications for these conditions.  In December 2004, Plaintiff went to the emergency room at the local hospital due to stomach problems.  An EKG and ultrasound of Plaintiff's abdomen in mid-December 2004 regarding Plaintiff's stomach issue were both normal.  Plaintiff reported that her stomach pain continued in early January 2005, and a subsequent CT scan of Plaintiff's abdomen demonstrated no abnormalities.  A later CT scan of Plaintiff's chest revealed early signs of emphysematous changes.  Dr. Ramaswami later reviewed this report and instructed Plaintiff to cease smoking cigarettes.

Subsequently, Ms. Kirner referred Plaintiff's entire medical record for an independent review by Medical Advisory Group ("MAG") and requested that they conduct an interview with Dr. Ramaswami, in order to "clarify [Plaintiff's] current functionality and her [restrictions and limitations]."  MAG assigned Dr. Todd J. Lyon to review Plaintiff's medical record and discuss that record with Dr. Ramaswami.  Dr. Lyon's report, dated February 22, 2005, reviewed Plaintiff's medical history, beginning with her original lifting injury in 1994.  Dr. Lyon noted that

in 1995-96, Plaintiff underwent a C5-6 discectomy and fusion as a result of degenerative disc disease with disc bulging, although one of Plaintiff's physicians did not believe that neurosurgical intervention was indicated for Plaintiff.  Dr. Lyon also noted that on May 30, 1996, Dr. Sachs indicted that Plaintiff was doing well postoperatively, had excellent alignment and healing from her surgical fusion, and that her examination was unremarkable, although she complained of left arm pain.

Dr. Lyon stated that Plaintiff's "radiographic studies show no evidence of disc herniation, spinal stenosis or nerve root impingement and do not appear to provide evidence explaining Ms. Tucker's widespread complaints."  Dr. Lyon noted that although Dr. Ramaswami's medical records indicated a diagnosis of fibromyalgia and reflex sympathetic dystrophy, Plaintiff's medical records did not provide any objective, physical examination findings supportive such diagnoses.  Dr. Lyon also noted that, based upon a review of Dr. Ramaswami's handwritten notes from February of 2004 through January of 2005, "[p]hysical exam findings were essentially unremarkable except for on one occasion in October of 2004 when Dr. Ramaswami made note of 'back tight muscles'."

In his report to Hartford, Dr. Lyon noted the following about his conversation with Dr. Ramaswami:

> Dr. Ramaswami basically indicated that Ms. Tucker currently had a chronic myofascial pain picture.  He verified that she did not have focal neurologic deficits.  He agreed that she would have the following restrictions and limitations: no lifting greater than 20 lbs, no hyperextended cervical positions and no repetitive or prolonged overhead work with the upper extremities.  These restrictions were felt medically indicated, upon the basis of her continued neck pain complaints and previous cervical fusion.  Dr. Ramaswami indicated Ms. Tucker had no other medical restrictions or limitations at the present time and he

8

indicated her tolerance for working would be related to her subjective complaints only.

In a letter dated February 21, 2005, Dr. Lyon attempted to confirm the details of his conversation with Dr. Ramaswami, stating that he would assume that Dr. Ramaswami agreed with his understanding of the conversation if he did not hear from him within five business days.  Dr. Lyon also stated that Dr. Ramaswami agreed that Plaintiff "appeared to have a chronic myofascial pain syndrome and her tolerance for working was largely based on her subjective experience."  Dr. Lyon concluded that "[t]here are no other medically supported restrictions or limitations at the present time based on the information reviewed," aside from those noted above, and it "appears that Judy Tucker's functionality is such that she is capable of full-time employment, which does not involve the above noted restrictions and limitations."  He further stated, "This suggests that she retains capabilities for walking, sitting, standing, driving and upper extremity functionality within the context of the restrictions and limitations noted above."[2]

_____

[2]The following information was obtained from Dr. Ramaswami's deposition.  However, as discussed in Section III, *supra*, such evidence will not be considered.

In his deposition, Dr. Ramaswami stated that he did not think he had ever seen the letter before because, although it was in the chart, it was not initialed.  He also stated that "I really did not feel that anything mentioned here was out of the ordinary or totally inaccurate that I needed to correct it," but in retrospect the letter would be more helpful if it was more detailed because "it does not truly reflect the medical condition."  Dr. Ramaswami further stated that, in retrospect, he "would include all her diagnoses, among others, chronic back pain, disc disease, degenerative disc disease, . . . status post neck surgery, history of cervical disc herniation, history of shoulder injury, multiple muscle spasms in back and cervical region, depression, anxiety, and chronic pain . . . and fibromyalgia."

Dr. Ramaswami testified that during his conversation with Dr. Lyon, he indicated that Plaintiff's tolerance for full-time employment would be based on her subjective experience because "her tolerance level could not be objectively measured," but her subjective statements of pain were consistent with his diagnoses.  He noted that the five to ten minute telephone call was an unexpected

Subsequently, Ms. Kirner requested an Employability Analysis Report concerning Plaintiff, which was performed by Marvin Bryant, MS, CRC.  After providing an overview of Dr. Lyon's report, Mr. Bryant reviewed Plaintiff's education, training, and work history and performed a transferable skills analysis.  Mr. Bryant concluded that there were at least two occupations that Plaintiff could perform and would result in a wage greater than that received by Plaintiff in her former occupation–Gate Guard and School Bus Monitor.

On April 26, 2005, Ms. Kirner determined that Plaintiff was no longer entitled to receive long term disability benefits under the Policy.  Ms. Kirner's letter stated, "It has been determined that the weight of the evidence establishes you are no longer totally disabled from Any Occupation and LTD benefits will not longer be payable.  This claim has been terminated effective 5/1/2005."  The letter also informed Plaintiff of her rights pursuant to ERISA, including her right to appeal the determination and the right to submit additional documents and information in support of her claim for benefits.

By letter dated August 18, 2005, John J. Greco, Esq. informed Hartford that he had been retained by Plaintiff with regard to her claim for long term disability benefits under the Policy and appealed Ms. Kirner's decision to terminate benefits.  In support of Plaintiff's appeal, Mr. Greco provided the following documents:

1.  Medical reports of Dr. Alfred T. Frontera, M.D., dated June 20, 2005 and July 28, 2005;
2.  Curriculum vitae for Dr. Frontera;

---

and unscheduled, that he was in the middle of seeing another patient at the time, and that he did not have Plaintiff's chart in front of him while talking to Dr. Lyon. He did not recall whether Dr. Lyon discussed the issue of sedentary work capacity with him, but that he did not believe that Plaintiff would be able to tolerate it.

   3.  MRI report relating to lumbar spine dated July 9, 2005;

   4.  MRI report relating to left hip dated July 15, 2005;

   5.  EMG report dated July 19, 2005; and

   6.  Medical records from Ravi Ramaswami, M.D.

Further, Mr. Greco stated that the medical records supported the conclusion that Plaintiff suffered from the following:

   1.  Cervical disc disease and mild cervical spinal stenosis;

   2.  Chronic C5-6 denervation;

   3.  Carpel tunnel syndrome on both sides;

   4.  Lower back pain secondary to spinal stenosis at L3-4;

   5.  Central spinal stenosis at L4-5;

   6.  Fibromyalgia which appears to be post traumatic in origin; and

   7.  Chronic pain syndrome.

Dr. Frontera's June 20, 2005 letter began with an overview of Plaintiff's medical history and noted that Plaintiff "has been generally uncomfortable."  Dr. Frontera concluded that Plaintiff had "cervical disc disease status post fusion and now has mild cervical central spinal stenosis," and "would need EMG studies of the upper extremities to further evaluate this."  He also stated that Plaintiff had "low back pain with decreased ROM of the L-spine suggesting disc," and that Plaintiff would have "MRI scanning of the L-spine and also of the left hip which she can barely move."  Further, Dr. Frontera concluded that Plaintiff appeared "to have fibromyalgia," and wanted to start her on Elavil to help her sleep and relieve some of the fibromyalgic pains.  He stated that he would not "define her complete system process" at that point, and she would need EMG studies for that to occur.  Finally, Dr. Frontera concluded that pain management may be a possibility, and Plaintiff had chronic pain syndrome.

In his follow-up letter of July 28, 2005, Dr. Frontera reported that Plaintiff's EMG "showed bilateral CTS on both sides."  He stated that Plaintiff "had chronic denervation, reinnervation in C5-6, myotomes on both sides with old bilateral C5-6 radiculopathies."  He also stated that Plaintiff's MRI of the left hip "showed joint effusion with left acetabular joint on the right and there was suggestion of a paralabral cyst on the left which would be related to the labral tear," for which she should see an orthopedist.  Dr. Frontera further noted that MRI scanning of Plaintiff's L-spine "showed mild central canal stenosis at L3-4 with left neural foraminal stenosis and moderate central canal stenosis at L4-5."

Dr. Frontera concluded that Plaintiff "has cervical disc status post fusion C5-6 now with mild cervical spinal stenosis and because of this she has chronic C5-6 denervation, reinnervation and mild CTS ";"low back pain secondary to mild spinal stenosis at L3-4, moderate central spinal stenosis at L4-5 and she has had fibromyalgia which appears to be post-traumatic in origin"; and chronic pain syndrome.  Although Dr. Frontera suggested Cymbalta, Plaintiff stated that she has become a "non-medicine person" since her sister almost lost her kidney with medication.  Dr. Frontera also suggested pain management, but Plaintiff stated she was fearful of needles and having that done, so she agreed to try a Lidocaine patch.  Finally, Dr. Frontera opined that Plaintiff is "totally disabled" because "[t]here are too many problems that would prevent any type of work" and sitting, standing, picking, lifting, and bending are all "contraindicated" in Plaintiff.

Ms. Pina Gulino, the Hartford Appeals Specialist assigned to the case, reviewed the claim file and referred Plaintiff's medical records to Gerry Smith, M.D., Certified Independent Medical Examiner and Diplomat in Physical Medicine and Rehabilitation, with three specific questions:

12

1. Please define any functional limitations [as of May 1, 2005] and beyond.
2. Is the pain component consistent with the medical record?
3. Are there any limitations due to medications?

On September 13, 2005, Dr. Smith issued a letter to Ms. Gulino concluding as follows:

> As mentioned previously, a self-reported symptom does not in and of itself justify a restriction.  For example, many individuals work in spite of pain.  The medical records imply that treating physicians and Ms. Tucker have focused on symptoms, especially pain and not on function.

> The objective medical documentation fails to substantiate a basis for total disability in this claimant.

The Court notes that Dr. Smith stated that he did "not doubt that Ms. Tucker very well may have a diagnosis of fibromyalgia, [but] Dr. Frontera did not document tender points to support this diagnosis."

In response to Ms. Gulino's question about functional limitations, Dr. Smith stated that he found "no objective basis to preclude this claimant from performing the essential duties of sedentary work on a full-time basis" stating that he agreed with the limitations set forth in Dr. Lyon's letter to Dr. Ramaswami.  Dr. Smith included additional limitations of "no use of vibratory tools and no repetitive wrist flexion or extension movements secondary to the EMG findings supporting a diagnosis of carpal tunnel syndrome."  Regarding the pain component, Dr. Smith stated that "[c]omplaints of pain are subjective in nature," and although a physician may try to objectively measure pain with a 0-10 pain scale, "[t]he medical records did not indicate attempt to try to document or measure the complaints of pain."  He stated, "Overall, I do believe that Ms. Tucker does have some pain and the EMG studies and radiologic studies indicate

diagnoses and anatomical findings that could indeed cause pain.  Therefore, overall, I do believe

that the pain component is consistent with the medical records."  Finally, Dr. Smith stated that

his review of the medical records did not support any limitations due to medications.

Subsequently, Ms. Gulino referred Plaintiff's claim, attaching Dr. Smith's report, to

Marvin Bryant for employability analysis, noting that Dr. Smith opined that Plaintiff was capable

of sedentary work with some additional restrictions and limitations and requesting that Mr.

Bryant "revise [his] report to identify occupations more suited to this claimant."  Mr. Bryant

concluded that Plaintiff could perform the occupation of Surveillance System Monitor, a

sedentary position that would result in a wage greater than that received by Plaintiff in her former

occupation.

In a letter dated September 19, 2005, Ms. Gulino concluded that the initial determination

to deny further long term disability benefits was correct.  She stated:

> It is our determination that satisfactory proof of continued Disability from any
> occupation beyond April 30, 2005, has not been provided, and a revised
> Employability Analysis Report identified a representative sample occupation
> within Ms. Tucker's functional capabilities and within the earnings requirements
> of the policy, therefore, this termination was appropriate.

This was Hartford's final decision on the claim.

## PROCEDURAL BACKGROUND

On October 12, 2005, Plaintiff commenced this action in the Supreme Court of the State

of New York, County of Ulster.  On November 21, 2005, Defendant Hartford removed the action

to this Court.  Plaintiff filed an Amended Complaint on February 6, 2006. Plaintiff filed a Second

Amended Complaint on April 6, 2006, alleging that she "is entitled to Judgment enforcing her

rights under the terms of her Plan, to recover benefits due under the terms of her Plan, to clarify

her rights to future benefits under the terms of her Plan, and for attorney's fees" pursuant to

ERISA § 502(a)(1)(B), as amended 29 U.S.C. § 1132(a)(1)(B).

## DISCUSSION

### I.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 authorizes a Court to enter summary judgment against

a party where "there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).

### II.  Standard of Review

The parties agree that ERISA governs this action.  ERISA provides a plan beneficiary

with a right to judicial review of a benefits determination.  *See* 29 U.S.C. § 1132(a)(1)(B).   An

administrator's decision to deny benefits under an employee welfare plan is reviewed

*de novo*, unless the benefit plan gives the "administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber*

*Co. v. Brunch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989).  When the benefit

plan gives the "administrator or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan," the district court's review is for an abuse of

discretion.  *Id*.  Under such a standard, referred to in this Circuit as an arbitrary and capricious

standard, a reviewing court may set aside the plan's decision only if it is "without reason,

unsupported by substantial evidence or erroneous as a matter of law."  *Pagan v. NYNEX Pension*

*Plan*, 52 F.3d 438, 442 (2d Cir. 1995).

15

Here, the Policy in question provides that "[t]he Hartford reserves the right to determine if proof of loss is satisfactory. "  Defendant cites several decisions examining the exact same policy language holding that such policy language provides the claim administrator with sufficient discretionary authority to make benefit claim eligibility determinations, and thus, mandates the use of the arbitrary and capricious standard of review.  *Vesaas v. Hartford Life and Accident Ins. Co.*, 1997 WL 561515 (8th Cir. Sept. 11, 1997); *Holman v. Hartford Life and Accident Ins. Co.*, 2006 WL 3210040 (W.D. Ark. Nov. 6, 2006); *Donatiello v. Hartford Life and Accident Ins. Co.*, 344 F. Supp. 2d 575, 579-80 (E.D. Mich. 2004) (noting that the parties stipulated that the arbitrary and capricious standard of review should apply); *Goldman v. Hartford Life and Accident Ins. Co.*, 2004 WL 2414084 (E.D. La. Oct. 27, 2004); *Sherry v. Hartford Life and Accident Ins. Co.*, 314 F. Supp. 2d 714 (N.D. Ohio 2004) (noting that the parties agree that the arbitrary and capricious standard applies); *McClanahan v. Hartford Life and Accident Ins. Co.*, 2000 WL 1923503 (E.D. Mich. Nov. 21, 2000); *Caesar v. Hartford Life and Accident Ins. Co.*, 947 F. Supp. 204 (D.S.C. 1996).  However, the Court notes that none of these originated in the Second Circuit.

Defendant also cites *Jones v. UnumProvident Corp.*, 2002 WL 32136676 (D. Conn. Jan. 22, 2002), in support of its argument.  There, the district court applied the arbitrary and capricious standard where the "Plan sets forth a specific definition of total disability, . . . gives the administrator the right to require additional written proof to verify the continuance of any disability, and the Plan requires that evidence of insurability must be based on medical information that is acceptable to . . . the Plan administrator."  *Id*. at *6.  The district court in *Jones* relied upon the decision in *Kocsis v. Standard Ins. Co.*, 142 F. Supp. 2d 241 (D. Conn.

16

2001), in which the district court applied the arbitrary and capricious standard where the policy reserved to the insurance company "full and exclusive authority . . . to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy," and "[t]he right to determine: a. Your eligibility for insurance; b. Your entitlement to benefits; c. The amount of benefits payable to you; d. The sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.".

Plaintiff cites *Kinstler v. First Reliance Standard Life Ins. Co*., 181 F.3d 243, 251-52 (2d Cir. 1999), in support of her argument for *de novo* review.  There, the Second Circuit stated:

> In our Circuit, we have recognized that "'magic words such as "discretion" and "deference"' may not be 'absolutely necessary to avoid a [*de novo*] standard of review." *Jordan v. Retirement Committee of Rensselaer Polytechnic Institute*, 46 F.3d 1264, 1271 (2d Cir. 1995) (quoting *Schein v. News America Publishing Inc*., No. 89 Civ. 0052, 1991 WL 117638, at *4 (S.D.N.Y. June 24, 1991)).  At the same time, we have noted that the use of such words "is certainly helpful in deciding the issue." *Id*.  When we have deemed the arbitrary and capricious standard applicable, the policy language reserving discretion has been clear.  For example, in *Ganton Technologies, Inc. v. National Industrial Group Pension Plan*, 76 F.3d 462, 466 (2d Cir. 1996), the plan explicitly provided that the trustees had authority to "resolve all disputes and ambiguities relating to the interpretation of the Plan."  In *Zuckerbrod v. Phoenix Mutual Life Insurance Co.*, 78 F.3d 46, 48 (2d Cir. 1996), the policy used the phrase "in our judgment" to modify a determination of eligibility for benefits.

*Id*. at 251.

In *Kinstler*, the policy language provided, "We will pay a Monthly Benefit if an Insured . . . (4) submits satisfactory proof of Total Disability to us."  *Id*. at 251.  In finding that the policy language was "insufficient to preclude *de novo* review," the court first reasoned that it was unclear whether the language meant that the claimant must submit to the insurance company proof that is satisfactory in general or satisfactory to the insurance company.  *Id*. at 251-52.  The

court stated that "unless a policy makes it explicit that the proof must be satisfactory *to the decision-maker*, the better reading of 'satisfactory proof' is that it establishes an objective standard, rather than a subjective one." *Id*. at 252.  The court also noted that "[s]ince the plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, . . . needless ambiguity in the wording of the policy should be resolved against [the insurance company]." *Id*.

Defendant attempts to distinguish *Kinstler* from the case at bar by arguing that the Second Circuit's applied the *de novo* standard of review in that case because the policy language was ambiguous regarding who determined whether proof of loss was satisfactory.  However, the court in *Kinstler* also stated that "a more fundamental point than this fine distinction about wording is that the word 'satisfactory,' whether in the phrase 'satisfactory proof' or the phrase 'proof satisfactory to [the decision-maker]' is an inadequate way to convey the idea that a plan administrator has discretion" because "[e]very plan that is administered requires submission of proof that will 'satisfy' the administrator." *Id*.

Additionally, in *O'Sullivan v. Prudential Ins. Co. of America*, 2001 WL 727033, *3 (S.D.N.Y. June 28, 2001) (expressly approved of in *Nochols v. Prudential Ins. Co. of America*, 406 F.3d 98, 109 (2d Cir. 2005)), the district court stated that "a review of the jurisprudence that has developed post-*Kinstler* indicates that an adequately specified grant of discretion, that would subject a determination respecting a claimant's eligibility for benefits to the arbitrary and capricious standard of review, must contain more than the phrase 'satisfactory evidence' or the word 'determines.'"(holding that plan language indicating that the insurance company will pay benefits "after receiving satisfactory proof of loss" and "determines" when all of the conditions

18

for total disability are met are insufficient indicators of discretion) (citing *Leonard v. First Reliance Standard Life Ins.,* No. 98 Civ. 3352, 1999 WL 688434 at *2 (S.D.N.Y. Sept. 2, 1999) (*de novo* review applied when benefit plan's policy required submission of "satisfactory proof" of total disability to the plan administrator); *Barnable v. First Fortis Life Insurance Company,* 44 F.Supp.2d 196, 202-203 (E.D.N.Y.1999) (*de novo* review applied despite benefit plan language including "satisfactory evidence" and plan administrator's ability to adjust benefit amounts if he finds that the amount of benefits is different from what was actually considered).

The Court notes that this is a very close question.  Recently, in *Krauss v. Oxford Health Plans, Inc*., 2008 WL 495654, * (2d Cir. Feb. 26, 2008), the Second Circuit stated:

> To be sure, our opinions regarding the bestowal of discretion by use of the verb "determine" provide little guidance.  *Compare Fay*, 287 F.3d at 104 (concluding that the benefit plan there considered "invoke[d] discretion by defining 'Medically Necessary' as those services which, *'as determined by [the]* . . . *Medical Director*,' meet four listed requirements" (emphasis in original) (second alteration in original) (quoting benefits plan), with *Nichols*, 406 F.3d at 108-09 (finding, without citation to *Fay*, that plan language to the effect that a disability "exists when [the insurer] determines that" each of several specified conditions was met did not confer discretionary authority because the language required that the insurer's decisionmaking power be constrained by "objective standards").  But, we think that where, as here, the terms of a benefits plan grant the defendant the right to "determine" what constitutes a "reasonable charge," and the only source that might bear on what is reasonable is "data compiled by [HIAA] and other recognized [but unspecified] sources, " Suppl. Certificate, Sec. I, subsec. 7 ("Your Financial Obligations"), the Plan confers discretion to determine which sources to rely upon in determining the UCR charge in any given circumstance.

The case at bar is distinguishable.  Although the language in this plan appears to be subjective with regard to whether the proof of loss is satisfactory, the court in Krauss not only relied upon the insurer's right to "determine," but also conferred discretion to determine which sources to rely upon.  Furthermore, the policy also allowed the insurer to "adopt reasonable policies,

procedures, rules, and interpretations to promote the orderly and efficient administration of this Certificate."

As in *Kinstler* and *O'Sullivan*, the Court finds that the Policy language in this case is insufficient to preclude *de novo* review. "Where an ERISA plan does not accord an administrator 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' a district court reviews all aspects of an administrator's eligibility determination, including fact issues, *de novo*." *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 441-42 (2d Cir. 2006) (citations omitted).

## III.   Consideration of Evidence Outside Administrative Record

"Where, as here, the plan administrator is not disinterested (i.e., Hartford was both the plan administrator and insurer), 'the decision whether to admit additional evidence is one which is discretionary with the district court, but which discretion ought not to be exercised in the absence of good cause." *Paese*, 449 F.3d 435, 441-42 (2d Cir. 2006) (citing *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 66 (2d Cir. 1997)). *See also Conners v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 134-35 (2d Cir. 2001)).

Plaintiff cites *Paese* in support of her contention that the deposition testimony of Dr. Ramaswami, which was not part of the administrative record, should be considered. In *Paese*, the Second Circuit upheld the district court's finding of good cause for the admission of a report because "it was highly probative and written by a disinterested party who had actually examined [the insured], and because [the insured] was not at fault for the report's initial absence from the record." 449 F.3d at 441 (noting that the district court reasonably inferred that the report was not

20

in the insured's hands until after the insurer made its final decision when the report was written after the insurer made its initial decision).  Plaintiff argues that the deposition is highly probative of Plaintiff's condition, and was written by an individual who actually examined the Plaintiff.  However, Plaintiff does not argue that she did not have the opportunity to provide clarifying remarks from Dr. Ramaswami during the appeals process.  Therefore, the Court finds *Paese* distinguishable.  The Court declines to consider Dr. Ramaswami's deposition testimony.

## IV.   *De Novo* Review

Hartford argues that it legitimately credited the opinions of Drs. Lyon and Smith because Plaintiff's treating physician agreed with the limitations and restrictions on Plaintiff's activities, as suggested by Dr. Lyon.  Hartford states that the documents submitted provided a conflicting view of Plaintiff's diagnoses, capabilities, and limitations, ad therefore, Hartford was entitled to rely on the medical records reviews of the two independent physicians.  The Court does not agree.  Upon *de novo* review of the entire administrative record, the Court cannot uphold the decision of Hartford to deny Plaintiff long term disability benefits.

First, while "ERISA Plan administrators need not give special deference to a claimant's treating physician," they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Paese*, 449 F.3d at 442 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003)).  While the Supreme Court has held that no special deference to a claimant's treating physician is required, "this does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative."  *Id.*

21

Here, Dr. Ramaswami, Plaintiff's treating physician, indicated on the October 2004 Attending Physician Statement that Plaintiff was unable to perform the activities of standing, walking, sitting, lifting/carrying, reaching/working overhead, pushing, pulling, driving, and keyboard use/repetitive hand motion for prolonged periods of time.  Furthermore, Dr. Frontera, who examined Plaintiff, found that sitting, standing, picking, lifting, and bending are all "contraindicated" in Plaintiff.  Furthermore, he supported these conclusions by noting that Plaintiff's EMG "showed bilateral CTS on both sides," Plaintiff "had chronic denervation, reinnervation in C5-6, myotomes on both sides with old bilateral C5-6 radiculopathies," and Plaintiff's MRI of the left hip "showed joint effusion with left acetabular joint on the right and there was suggestion of a paralabral cyst on the left which would be related to the labral tear." Dr. Frontera further noted that MRI scanning of Plaintiff's L-spine "showed mild central canal stenosis at L3-4 with left neural foraminal stenosis and moderate central canal stenosis at L4-5. Dr. Frontera concluded that Plaintiff "has cervical disc status post fusion C5-6 now with mild cervical spinal stenosis and because of this she has chronic C5-6 denervation, reinnervation and mild CTS ";"low back pain secondary to mild spinal stenosis at L3-4, moderate central spinal stenosis at L4-5 and she has had fibromyalgia which appears to be post-traumatic in origin"; and chronic pain syndrome.

Drs. Lyon and Smith, who have never examined Plaintiff, concluded that Plaintiff's restrictions and limitations were as follows: no lifting greater than 20 lbs, no hyperextended cervical positions and no repetitive or prolonged overhead work with the upper extremities.  Dr. Smith included additional limitations of "no use of vibratory tools and no repetitive wrist flexion or extension movements secondary to the EMG findings supporting a diagnosis of carpal tunnel

syndrome."  Additionally, Dr. Smith stated that he did "not doubt that Ms. Tucker very well may have a diagnosis of fibromyalgia, [but] Dr. Frontera did not document tender points to support this diagnosis," and believed "that Ms. Tucker does have some pain and the EMG studies and radiologic studies indicate diagnoses and anatomical findings that could indeed cause pain." Therefore, he concluded that "the pain component is consistent with the medical records."

Furthermore, Hartford recognizes that the EMG dated July 19, 2005, indicates that Plaintiff "has mild Carpal Tunnel Syndrome bilaterally, with chronic denervation/reinervation in the C5/6 myotomes," an "MRI of the Lumbar Spine dated July 9, 2005 revealed a mild central canal stenosis on L3/4 with left neural foraminal stenosis and moderate central canal stenosis at L4/5," and an "MRI of the left Hip dated July 9, 2005 revealed mild joint effusion left acetabular joint as compared to the right."

Second, "[i]t has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability." *Conners*, 272 F.3d at 136 (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)).  "While a district court reviewing an administrator's decision *de novo* is not required to accept such complaints as credible, . . . it cannot dismiss complaints of pain as legally insufficient evidence of disability . . . ." *Id.*  Here, the observations of Dr. Frontera, coupled with the objective medical evidence of Plaintiff's pain as discussed by Dr. Frontera, lends credibility to Plaintiff's subjective complaints of pain.  Even Hartford's physician agrees that the "pain component is consistent with the medical records," did not doubt that Plaintiff may have fibromyalgia, believed that Plaintiff has some pain, and "EMG studies and radiologic studies indicate diagnoses and anatomical findings that could indeed cause pain."

Third, a court acts within its discretion when it considers the Social Security Administration's finding as some evidence of total disability.  *Paese*, 449 F.3d at 442.  Here, Plaintiff was awarded Social Security disability in 1996 based upon a finding that she did "not have the residual functional capacity for even sedentary work . . . ."

Finally, the Court notes that Hartford paid total disability benefits to Plaintiff under the "any occupation" standard from September 26, 1996 through April 30, 2005.  The Court also notes that in conducting his first employability assessment of Plaintiff, Mr. Bryant concluded that Plaintiff could perform the occupations of Gate Guard and School Bus Monitor.  After Hartford instructed Mr. Bryant to "revise [his] report to identify occupations more suited to this claimant," Mr. Bryant concluded that Plaintiff could perform the sedentary occupation of Surveillance System Monitor, an occupation which was not previously identified.

Although the Court cannot uphold Hartford's decision, the Court does not find the current record so clear or compelling as to warrant an order directing Hartford to provide long term disability benefits to Plaintiff.  Therefore, the Court vacates Hartford's denial of Plaintiff's application for long term disability benefits and remands the matter to Hartford for reconsideration.  Plaintiff must be afforded an opportunity to supplement her appellate submissions with additional information.  Additionally, Hartford may request that Plaintiff undergo an independent medical examination.

To ensure that Hartford makes a timely determination on this issue, the Court directs that Hartford shall either make its determination not later than **June 1, 2008**, or shall begin paying Plaintiff interim long term disability benefits from that date forward if no determination has been made by June 1, 2008.  Of course, if Hartford again determines that Plaintiff does not qualify for

24

long term disability benefits, Hartford may discontinue payment.  Alternatively, if Plaintiff

qualifies for "any occupation" long term disability benefits, then Hartford will owe back benefits

for the period during which no payments were made.

## CONCLUSION

For the reasons herein stated,

IT IS THEREFORE ORDERED that Defendant's Motion for Summary (Docket No. 26)

be, and it is hereby, DENIED.

IT IS FURTHER ORDERED THAT Plaintiff's Cross Motion for Summary Judgment

(Docket No. 32) be, and it is hereby, GRANTED to the extent that Hartford's decision to deny

long term disability benefits to the Plaintiff Judy A. Tucker is hereby VACATED and the matter

is remanded to Hartford for further consideration in a manner consistent with this Opinion and

Order.  Hartford shall either make its "any occupation" benefits determination by June 1, 2008,

or it shall begin paying such benefits going forward from that date.

IT IS SO ORDERED this   14th   day of March, 2008.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT COURT